**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

JOEY MIDGETT,

      Petitioner,

v.                                            Case No. 8:17-cv-1801-T-33JSS

SECRETARY, DEPARTMENT
OF CORRECTIONS,

      Respondent.

_____/

## ORDER

Joey Midgett, a Florida prisoner, timely filed a *pro se* second amended petition for writ of habeas corpus under 28 U.S.C. § 2254 challenging his Polk County conviction. (Doc. 10). Respondent filed a response and supplemental response. (Docs. 17, 23). Midgett filed a reply and supplemental reply. (Docs. 27, 28). Upon consideration, the petition is DENIED.

### Procedural History

Midgett was convicted after a jury trial of one count of second degree murder. (Doc. 19, Ex. 27, Vol. II, pp. 321-22). The state trial court sentenced him to life in prison. (Doc. 19, Ex. 27, Vol. III, p. 347). The state appellate court *per curiam* affirmed the conviction and sentence. (Doc. 19, Ex. 4). Midgett's motion for postconviction relief, filed under Florida Rule of Criminal Procedure 3.850, was denied. (Doc. 19, Exs. 6, 7, 10, 16). The state appellate court *per curiam* affirmed the denial of relief. (Doc. 19, Ex. 20). Midgett's successive postconviction motion was also denied. (Doc. 24, Exs. 28, 29). The state

appellate court *per curiam* affirmed the lower court.  (Doc. 19, Ex. 24).

**Factual Background;[1] Midgett's Theory Of Defense**

Midgett lived with his girlfriend, D.B.  D.B. claimed that the victim, Jonas Ward, had sexually assaulted her in the past and was sharing photographs and/or videos of the assault.  D.B. frequently talked about Ward's actions, which upset both her and Midgett.  In the early morning hours of December 29, 2009, D.B. became "aggravated" and "frustrated" and picked up a knife, saying that she "hate[d]" the person who raped her.  (Doc. 19, Ex. 27, Vol. VI, pp. 553-54).  Midgett took the knife from D.B., and then drove her and their friend Holly Evans to Ward's house.  Midgett, armed with a cocked, loaded handgun, approached the home while D.B. and Evans remained in the truck.  A man opened the door.  When Midgett told him he was there to retrieve the images, the man said, "Go fuck yourself," and shut the door on Midgett's hand.  Midgett attempted to push the door open, fired one shot, ran back to his truck, and left.

Ward's girlfriend was coming out of a bathroom in the house when she heard a gunshot.  She found Ward unresponsive by the front door and called 911.  Ward died as a result of a single gunshot to the head.  Police located one bullet hole in the front door, one shell casing on the porch, and one bullet inside the house.

Police made contact with Midgett the next day, December 30, 2009.  He allowed police to search his home.  Inside a hole in the bedroom closet, police saw but were unable to retrieve a box of ammunition and an object inside a sock.  When police talked to him about their findings, Midgett told them about his confronting Ward.  He stated that when the

---

[1] The factual summary is based on the trial transcript and appellate briefs.

door crushed his finger, he pushed on the door and the gun went off, but that he did not know at the time that he had killed someone. Midgett said that he did not intend to harm anyone. Midgett was arrested, and police retrieved the sock and found a loaded .45 caliber pistol inside. Midgett was transported to the police station and gave a recorded interview during which he again stated that he did not intend to hurt anyone. A Florida Department of Law Enforcement analysis determined that the bullet and shell casing found at Ward's home were fired from the gun recovered from Midgett's bedroom closet. Either Midgett or D.B. had purchased ammunition for the gun several days before the shooting.

Midgett testified at trial that it was not Ward, but another man, John Draper, who answered the door. Draper knew both D.B. and Ward. Some evidence indicated that Draper had been romantically interested in D.B. and had been present at Ward's house on the night of the alleged assault, but became so mad that he left. Midgett claimed that the bullet from his gun did not kill Ward, but that John Draper was the "second shooter" that night who shot and killed Ward from inside the home. Defense witness Jonathan Markley testified that a man who went by "John John" stopped by a house party he had one night around New Year's covered in blood and asking for a change of clothes. Markley testified that John John stated he had just killed "the pervert," and that Markley knew people referred to Jonas Ward as "the pervert."

### Standard Of Review

The Antiterrorism and Effective Death Penalty Act ("AEDPA") governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief can only be granted if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Section 2254(d) provides that federal

habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor,* 529 U.S. 362, 412-13 (2000). A decision is an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

The AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694. *See also Harrington v. Richter*, 562 U.S. 86, 103 (2011) ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

The state appellate court affirmed the judgment and sentence and the denial of

postconviction relief without discussion. These decisions warrant deference under § 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore,* 278 F.3d 1245, 1254 (11th Cir. 2002). *See also Richter,* 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."). When a state appellate court issues a silent affirmance, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S.Ct. 1188, 1192 (2018).

### Discussion

<u>Ground One</u>

Midgett claims that the state trial court erred in denying his motion to suppress his statements to law enforcement. Midgett gave three statements to police. On the morning of December 30, 2009, after Sergeant Mike Evans stopped Midgett for a traffic infraction, Midgett went to the Bureau of Criminal Investigations ("BCI") with Sergeant Evans. There, he made his first statement "regarding what he did the previous night of the incident" and expressed displeasure with law enforcement's failure to act on D.B.'s complaint that Ward had assaulted her. (Doc. 19, Ex. 27, Vol. I, p. 84). Midgett also agreed to allow officers to search his home. Midgett and several officers went to his home, where Detective Aaron Campbell located ammunition and a sock that was later found to conceal a firearm. Midgett sat with officers in his front yard and gave a second, recorded statement. After his arrest,

Midgett was transported back to BCI, where he waived his *Miranda*[2] rights and gave a third, recorded statement.

Midgett claims that the trial court erred in denying his motion to suppress these statements. Midgett argues that he was in custody but was not given *Miranda* warnings when he made his first and second statements, and that police continued to question him after he invoked his right to counsel during his first statement. Further, he appears to argue that the *Miranda* waiver prior to his third statement was invalid because he had previously invoked his right to counsel.

A.   *Midgett's First Statement To Police*

The state court found that Midgett's first statement to police was admissible:

The Defendant claims that he requested an attorney during the first interview at BCI. The motion specifically states on page two, "When the Defendant later became aware of the investigation the Defendant asked for his attorney. When questioned as to whom his attorney was the Defendant could only recall "Kevin", and not the last name. He asked to look at his cell phone because the attorney's name and number were in the records. However, the Defendant was denied access to his phone." Had the Defendant requested counsel, no further interrogation would be allowed. The Defendant testified at the first evidentiary hearing that Detective Lopez asked him who his attorney was and he stated "Kevin". The Defendant could not recall his attorney's last name and stated that his attorney's telephone number was stored in his cell phone. However, the Defendant further testified that his cell phone was in his bedroom which is in conflict with the allegation in the Defendant's Motion to suppress. Detective Lopez testified at the first evidentiary hearing that the Defendant, at no time, requested an attorney and never mentioned any person named Kevin. In addition, Detective Lopez had no recollection of the Defendant ever requesting his cell phone. The Court had the opportunity to observe both witnesses regarding the Defendant's alleged request for counsel. The Court has also considered the testimony of the other witnesses who testified at both evidentiary hearings. The Court rejects the testimony of the Defendant that he requested counsel while at BCI during the first interview. Therefore the questioning at BCI is admissible

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

evidence.

The Defendant's Motion to Suppress also alleges that the Defendant was in custody and therefore should have been provided <u>Miranda</u> warnings. The Motion to Suppress states that law enforcement was in possession of the Defendant's telephone while at BCI during the first interview and refused to return it to him so that he could contact his attorney. This allegation is clearly in error as the Defendant testified at the evidentiary hearing that his cell phone was at his residence. In addition, the Defendant testified at the first evidentiary hearing that he never saw a law enforcement officer take possession of his cell phone and that he was unable to say that any law enforcement officer intentionally deprived him of access to his cell phone. The Defendant's own testimony contradicts the allegation in the Motion to Suppress that he was deprived of access to his cell phone by law enforcement. Based on the evidence presented at the evidentiary hearing, the argument that the Defendant was deprived access to his cell phone by law enforcement is rejected.

. . .

It is stated on page two of the Motion to Suppress that the Defendant agreed to go to the Polk County Sheriff's Office for an interview at the request of law enforcement. The allegation that the Defendant was in custody at the time he was originally contacted was first raised through the Defendant's testimony at the initial evidentiary hearing. The Defendant testified he was not allowed to drive his vehicle to BCI and that Detective Evans took his driver's license and did not return it until well after the search of the Defendant's residence was conducted and he was returned to BCI.

The court accepts the testimony of Detective Evans that he followed a vehicle leaving the Defendant's residence. The vehicle was driven through a stop sign without stopping. The vehicle was stopped by . . . Detective Evans who was in an unmarked vehicle. The Defendant produced his driver's license and his identity was confirmed. The Defendant was advised that Detective Evan[s's] supervisor wanted to speak with the Defendant and the Defendant voluntarily traveled with Officer Evans to BCI. The Court accepts the testimony of Detective Evans that the Defendant requested to ride with Detective Evans as the Defendant did not know where BCI was located. The Defendant was not handcuffed or restrained in any fashion and was allowed to ride in the front passenger seat with Detective Evans. The Defendant's testimony that he was directed to lock his truck and was required to come with Detective Evans to BCI is rejected in favor of the testimony of Detective Evans. Further, Detective Evans testified that he returned the Defendant's driver's license upon confirming the Defendant's identity during the traffic stop. The Defendant's testimony that his driver's license was not returned for hours is rejected.

It also appears that the Defendant contends that he was in custody at the time he was initially interviewed at BCI. This is contrary to the testimony of the detectives who questioned the Defendant. Detective Aguirre testified that he told the defendant that they were conducting a death investigation and that he advised the Defendant of the victim's name. There was no conversation about the shooting and the Defendant voluntarily signed forms consenting to the search of his vehicle and residence. After voluntarily consenting to the search of his residence, the Defendant said, "Let's get this done. I have nothing to hide". The Court finds that the Defendant voluntarily cooperated with law enforcement and was not in custody during the first interview.

(Doc. 19, Ex. 27, Vol. II, pp. 272-73, 274-75).

I.    Whether Midgett Was In Custody And Therefore Entitled To *Miranda* Warnings

*Miranda* warnings are required when a person is subject to custodial interrogation.

384 U.S. at 467-69. *See United States v. Partin*, 634 Fed. App'x 740, 746 (11th Cir. 2015)

("Miranda warnings are required only when a defendant is 'in custody,' meaning that there

has been either a formal arrest or a restraint on the defendant's freedom of movement that

is of the degree associated with a formal arrest."). In determining custody, a court asks

whether an innocent person in the subject's position would have felt free to leave:

Whether [an individual] was in custody prior to his formal arrest "depends on whether under the totality of the circumstances, a reasonable man in his position would feel a restraint on his freedom of movement to such extent that he would not feel free to leave." [*United States v.*] *McDowell*, 250 F.3d [1354, 1362 (11th Cir. 2001)]. "The test is objective: the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant." *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996). "[U]nder the objective standard, the reasonable person from whose perspective 'custody' is defined is a reasonable *innocent* person." *Id.* (emphasis added).

*United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006).

In assessing whether a reasonable person would have felt free to leave, relevant

considerations include the location and duration of the questioning, what statements were

made during the questioning, whether the individual was physically restrained, and whether the individual was released at the end of questioning. *Howes v. Fields*, 565 U.S. 499, 509 (2012). In addition to determining "whether an individual's freedom of movement was curtailed," courts must also consider whether the circumstances of the interview "present[ ] the same inherently coercive pressures as the type of station house questioning in *Miranda*." *Id.*

Sergeant Mike Evans testified at the suppression hearing that he was waiting outside of Midgett's house on the morning of December 30, 2009. (Doc. 19, Ex. 27, Vol. I, p. 44). When Midgett left in his vehicle, Sergeant Evans followed him and pulled him over after he ran a stop sign. (*Id.*, pp. 45-46, 48). Sergeant Evans testified that he asked for Midgett's driver's license to identify him, and gave it back to Midgett before informing him that detectives wanted to speak to him and asking if he was willing to come to the station and talk. (*Id.*, pp. 48-49; Doc. 19, Ex. 27, Vol. II, pp. 214-15). Sergeant Evans testified that Midgett was willing to go to the station, and, after asking if he could ride with Sergeant Evans because he did not know the way, traveled to BCI in the front seat of Sergeant Evans's car. (Doc. 19, Ex. 27, Vol. I, pp. 49-53). Midgett had no objection when Sergeant Evans asked to pat him down before he got in the car. (*Id.*, p. 53). Sergeant Evans and Midgett made small talk during the trip, and Midgett never indicated that he did not want to talk or had changed his mind. (*Id.*, p. 54).

At BCI, Detectives Gustavo Aguirre and David Lopez met with Midgett. Detective Aguirre testified that Midgett was not handcuffed at any time. (*Id.*, p. 83). Detective Aguirre testified that Midgett did not request his cell phone, that his cell phone had not been taken from him, and that Midgett was not denied access to any telephones. (*Id.*, p. 89). The

detectives explained to Midgett that Jonas Ward had died and explained the ongoing death investigation. (*Id.*, pp. 83-84). They asked Midgett for consent to search his residence and vehicle, and Midgett agreed. (*Id.*, p. 86). Detective Aguirre testified that Midgett said, "Let's go, let's get this over with, I have nothing to hide." (*Id.*). Detective Aguirre testified that he told Midgett it was his choice whether or not to talk to police. (*Id.*, p. 91).

The court accepted the officers' testimony and rejected Midgett's testimony to the contrary. This involved a determination of the witnesses' credibility. A credibility decision is a factual finding entitled to a presumption of correctness that can only be overcome by the presentation of clear and convincing evidence–a showing that Midgett has not made. 28 U.S.C. § 2254(e)(1). *See Rolling v. Crosby*, 438 F.3d 1296, 1301 (11th Cir. 2006) ("The factual findings of the state court, including the credibility findings, are presumed to be correct unless [the petitioner] rebuts the presumption by clear and convincing evidence."); *Baldwin v. Johnson*, 152 F.3d 1304, 1316 (11th Cir. 1998) ("We must accept the state court's credibility determination and thus credit [the attorney's] testimony over [the petitioner's]."); *Devier v. Zant*, 3 F.3d 1445, 1456 (11th Cir. 1993) ("Findings by the state court concerning historical facts and assessments of witness credibility are . . . entitled to the same presumption accorded findings of fact under 28 U.S.C. § 2254(d).").

The testimony that the court accepted reflects that Midgett made the choice to ride with Sergeant Evans to BCI after Sergeant Evans returned his license and that, at BCI, he was not restrained and did not change his mind about talking to police. *See Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (noting that the suspect voluntarily came to the police station in determining that an interview was not custodial). That the questioning took place at a police station does not in itself render the questioning custodial. *See California v.*

*Beheler*, 463 U.S. 1121, 1125 (1983) ("[The Supreme Court has] explicitly recognized that *Miranda* warnings are not required 'simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.'" (quoting *Mathiason*, 429 U.S. at 495)). Nor does the record establish that Midgett was coerced or physically restrained, or that the interview lasted for a long period of time. Finally, Midgett agreed afterwards to accompany officers to his home for a consensual search. Accordingly, Midgett does not establish that he was in custody, and therefore entitled to *Miranda* warnings, when he made his first statement to police at BCI. Midgett has not shown that the state court's determination was contrary to or involved an unreasonable application of clearly established federal law, or was based on an unreasonable factual determination.[3]

## II.  Whether Police Ignored Midgett's Request For An Attorney

Midgett claims that during his first interview, he asked to contact his attorney, "Kevin," but that police would not allow him to do so. Although he alleges a violation of his Fifth Amendment right to counsel, that right had not attached because Midgett was not in custody. The Supreme Court has "decided that once 'an accused has invoked his right to have counsel present during *custodial* interrogation . . . [he] is not subject to further interrogation by the authorities until counsel has been made available,' unless he initiates the contact." *Montejo v. Louisiana*, 556 U.S. 778, 787 (2009) (quoting *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981)) (emphasis added). *See also Bobby v. Dixon*, 565 U.S. 23,

---

[3] Midgett contends that the state court made an unreasonable factua  determination in concluding that the shooting was not discussed. While there was evidence that police explained the investigation into Ward's death, Detective Aguirre also testified that he did not believe he asked Midgett about the shooting and that Midgett did not speak about the incident itself. (Doc. 19, Ex. 27, Vol. I, pp. 84-85). Midgett has not shown that the state court's decision was based on an unreasonable determination of fact.

28 (2011) (the Supreme Court has "never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than 'custodial interrogation.'") (citation omitted).

Notwithstanding, Midgett fails to establish that police ignored his request for an attorney. Detective Aguirre testified that from the time he made contact with Midgett until they arrived at Midgett's residence, Midgett never asked for permission to contact his attorney or anyone named Kevin. (Doc. 19, Ex. 27, Vol. I, pp. 88-89). Detective Aguirre testified that Midgett was not deprived of his cell phone or other telephone access. (*Id.*, p. 89). In contrast, Midgett testified that while at BCI, he said he needed to call his lawyer, named Kevin. (*Id.*, p. 170).

The state court noted that it considered all of the testimony presented, and specifically "reject[ed] the testimony of the Defendant that he requested counsel while at BCI during the first interview." (Doc. 19, Ex. 27, Vol. II, p. 272). The court's decision involves a factual determination of Midgett's credibility, and Midgett has not shown, by clear and convincing evidence, that the state court's factual finding was incorrect. Accordingly, he fails to show that his statement was rendered inadmissible because police refused his request for an attorney. Midgett does not show that the state court's decision was contrary to or involved an unreasonable determination of clearly established federal law, or was based on an unreasonable determination of fact.

B.    *Midgett's Third Statement To Police*

Midgett has not clearly asserted in his federal habeas petition that the trial court erred in not suppressing his third statement to police, which was made at the police station after his arrest and after police provided *Miranda* warnings. However, he states:

After Mr. Midgett invoked his right to counsel, his response to police

questioning would be admissible only if he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked. Mr. Midgett did not re-initiate any conversation with detectives. Conversely, it was the detectives who continued to question Mr. Midgett after he invoked his right to counsel. Therefore, the other attempt by one of the detectives to establish Mr. Midgett's waiver of his right to counsel was ineffective. Accordingly, Mr. Midgett's statements to law enforcement officers should have been suppressed.

(Doc. 10, p. 5).

This contention is consistent with Midgett's appellate claim that his third, post-*Miranda* statement should have been suppressed on the ground that his *Miranda* waiver was invalid because he had already invoked the right to counsel during his first interview at BCI. (Doc. 19, Ex. 2, pp. 35-38). He claimed that, because he never reinitiated contact with police after invoking his right, any subsequent waiver was involuntary. In support, he cited *Miranda*, 384 U.S. at 474 ("If an individual states that he wants an attorney, the interrogation must cease until an attorney is present); *Edwards*, 451 U.S. at 484 ("[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated questioning even if he has been advised of his rights."); and *Smith v. Illinois*, 469 U.S. 91, 95 (1984) ("[I]f the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked."). Accordingly, the Court liberally interprets Midgett's federal habeas petition as challenging the admission of his third statement on this same basis.

Midgett has not shown that the state court unreasonably denied this ground. As addressed above, Midgett's Fifth Amendment right to counsel was not implicated because

he was not in custody when he made his first statement. Further, Midgett has not overcome by clear and convincing evidence the presumption of correctness afforded to the state court's factual finding that he did not request an attorney. And no other part of the third interview suggests that the waiver was involuntary. Specifically, Midgett did ask any questions or express any uncertainty when Detective Campbell recited his *Miranda* rights. (Doc. 19, Ex. 27, Vol. VI, pp. 544-45). Accordingly, Midgett fails to show that his post-*Miranda* statement was invalid for the reason alleged. He does not show that the state court's denial of his claim was contrary to or involved an unreasonable application of clearly established federal law, or was based on an unreasonable determination of fact.

C.    *Midgett's Second Statement To Police*

In finding admissible Midgett's second statement, made as police searched his home, the state court found that *Miranda* warnings were not required because Midgett was not in custody. (Doc. 19, Ex. 27, Vol. II, pp. 275-78). Midgett challenges several factual findings the state court made in reaching this decision, contending that the record refutes the findings. Even assuming that Midgett is correct and that his second statement should have been suppressed, however, he cannot obtain federal habeas relief. Any constitutional error in the second statement's admission must be considered under the harmless-error test set out in *Brecht v. Abrahamson*, 507 U.S. 619 (1993):

> In § 2254 proceedings, federal courts must evaluate constitutional errors under the harmless-error standard articulated in *Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). As *Brecht* explained, "[federal] habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Id.* at 637, 113 S.Ct. at 1722. To find "actual prejudice," a federal habeas court must conclude that the error "had substantial and injurious effect or influence in determining the jury's verdict." *Id.* (quoting *Kotteakos v. United States*, 328 U.S. 750,

776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)).

*Hittson v. GDCP Warden*, 759 F.3d 1210, 1233-34 (11th Cir. 2014) (footnote omitted).

The jury heard recordings of Midgett's second and third statements to police, and heard Detective Aguirre testify about Midgett's first statement, which was not recorded. This Court has reviewed the portions of the trial transcript concerning those statements. (Doc. 19, Ex. 27, Vol. V, pp. 394-407, 427-30, 434; Vol. VI, pp. 543-69). The crux of Midgett's comments during the second statement about his reasons for confronting Jonas Ward and about the shooting and events leading to it was also contained in the third statement. The second statement did, however, contain some remarks that were not included in either the first or third statements. First, Midgett agreed that after police searched his residence and found "some things," he started talking to them and decided he wanted to tell the truth. (Doc. 19, Ex. 27, Vol. V, p. 396). He also called Jonas Ward "filth" and a "piece of shit" who was destroying D.B.'s self-esteem, and stated that he did not know until talking to police that Ward had died. (*Id.*, pp. 398, 402, 406).

Midgett does not show that introduction of these statements had a substantial and injurious effect on the jury's verdict. Midgett's acknowledgment that he decided to talk after police found items in his house was not significant enough to influence the verdict in light of overall evidence of guilt, including the undisputed evidence about his motive; his admission that he confronted Ward with a cocked,[4] loaded firearm for which either he or D.B. had just purchased ammunition; the physical evidence indicating the bullet that went through Ward's door was fired from the gun located in Midgett's home; and the lack of

---

[4] Midgett told police in his third statement that he kept the gun cocked. (Doc. 19, Ex. 27, Vol. VI, p. 555).

evidence directly supporting the "second shooter" defense. And while Midgett's second statement contained specific negative descriptions about Ward, Midgett also said in his third statement that Ward was "a predator" and an "ugly person." (Doc. 19, Ex. 27, Vol. VI, p. 549). Finally, Midgett does not establish his statement that he did not know someone had died until police told him had a substantial and injurious effect on the jury's verdict. He has not demonstrated that the admission of his second statement was harmful under the *Brecht* test. Midgett has not shown entitlement to relief on Ground One.

*Ineffective Assistance Of Counsel*

Grounds Two through Thirteen allege ineffective assistance of trial counsel. These claims are analyzed under the standard announced in *Strickland v. Washington*, 466 U.S. 668 (1984). Midgett must demonstrate that his counsel performed deficiently in that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 687-88. Midgett must also show that he suffered prejudice by demonstrating "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Obtaining relief on a claim of ineffective assistance of counsel is difficult because "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105 (citations omitted). *See also Cullen v. Pinholster*, 563 U.S. 170, 202 (2011) (a petitioner must overcome the "'doubly deferential' standard of *Strickland* and AEDPA.").

<u>Grounds Two and Three</u>

The State charged Midgett in the alternative with second degree murder (count one) and third degree felony murder (count two). (Doc. 14, Ex. 27, Vol. I, pp. 15-16). The jury

returned a guilty verdict on both counts. (Doc. 14, Ex. 27, Vol. II, pp. 321-23). After receiving the verdict, the court orally adjudicated Midgett guilty of both counts before stating, "I adjudicate you on count 1. I'm reserving on count 2 pending further action on that." (Doc. 14, Ex. 27, Vol. VIII, p. 908). At the sentencing hearing, the trial court orally "set aside" count two. (Doc. 14, Ex. 27, Vol. II, p. 327). The written judgment and sentence was entered on count one only, and contained the notation, "Ct. 2 – Jury verdict set aside. No sentence imposed." (Doc. 14, Ex. 27, Vol. III, p. 347).

Midgett argues that trial counsel was ineffective in (1) failing to object or request that the jury be instructed on "alternative verdicts,'" which resulted in his being convicted in violation of double jeopardy; and (2) failing to move for a directed verdict and failing to object when the court set aside count two instead of count one.

The state court denied Midgett's claims:

> In claim 1, the Defendant asserts that trial counsel provided ineffective assistance of counsel for failing to object and/or request that the jury be instructed on "alternative verdicts" for counts one and two; causing the Defendant to be convicted in violation of double jeopardy principles. The Defendant was charged in the alternative with one count of second degree murder with a firearm and one count of third degree murder based on a theory of felony murder. The jury returned a verdict of guilty of both counts as charged. The Court adjudicated and sentenced the Defendant only as to count 1 (second degree murder) as the Defendant indicates in his motion. The Court finds that the jury's verdicts as to both counts were not inconsistent. The Court only adjudicated and sentenced the Defendant only as to count 1. No double jeopardy is involved in the Court's adjudication and sentencing as to count 1.
>
> The Defendant asserts that trial counsel was ineffective in failing to ask for an alternative jury instruction that would have allowed the jury to find him guilty of only one or the other of the two offenses. The Defendant asserts that he was prejudiced by this ineffectiveness because the jury may have only found him guilty of count 2 and not count 1. The Defendant's assertion is based on pure conjecture. A finding of prejudice to the Defendant cannot be found in this case based on the pure speculation that if given only one

choice the jury would have returned a verdict as to count 2 only.

The Court also notes that, at trial, the Defendant indicated that he had gone over the verdict form with his counsel and that . . . he was satisfied with the verdict form to be given to the jury. Based on the above, claim 1 is DENIED.

(Doc. 19, Ex. 7, pp. 1139-40) (court's record citations omitted).

Additionally, "for the reasons stated as to claim 1," the court denied claim 2, in which Midgett alleged that counsel was ineffective in failing to move for a directed verdict and object when the court set aside count two instead of count one. (*Id.*, p. 1140).

Initially, Midgett has failed to satisfy the requirement that a petitioner exhaust his federal claims in state court before presenting them in his federal habeas petition. *See* 28 U.S.C. § 2254(b)(1)(A). To properly exhaust his claims, Midgett was required to complete one full round of the state's appellate review process. *Pruitt v. Jones*, 348 F.3d 1355, 1358-59 (11th Cir. 2003). These claims are unexhausted because Midgett did not appeal from their denial. (Doc. 19, Ex. 18).[5] *See Leonard v. Wainwright*, 601 F.2d 807, 808 (5th Cir. 1979) ("In Florida, exhaustion usually requires not only the filing of a Rule 3.850 motion, but an appeal from its denial."). Specifically, because some of his postconviction claims were denied after an evidentiary hearing, he was required to raise in his appellate brief all arguments he wished the trial court to consider. *See* Fla. R. App. P. 9.141(b)(3)(C); *Cunningham v. State*, 131 So.3d 793 (Fla. 2d DCA 2012).

---

[5] On appeal, Midgett claimed that counsel was ineffective in presenting his motion for a new trial. Midgett alleged that, in the context of moving for a new trial, counsel should have made the arguments now raised in Grounds Two through Five of his federal habeas petition, "much like Midgett did in . . . his 3.850 motion." (Doc. 19, Ex. 18, p. 15). But even if the state appellate court interpreted his argument as presenting independent challenges to the denial of these claims and they are therefore exhausted, Midgett is not entitled to relief. For the same reasons addressed in the body of this Order, Midgett fails to show that the state appellate court's denial of the claims involved an unreasonable application of *Strickland* or was based on an unreasonable determination of fact.

State procedural rules do not provide for second collateral appeals. *See* Fla. R. Crim. P. 3.850(k) (stating that an appeal may be taken within 30 days of rendition of a final order denying postconviction relief). Therefore, Midgett's unexhausted claims are procedurally defaulted. *See Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001) ("If the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief."). A procedural default may be overcome if a petitioner establishes the applicability of either the cause and prejudice or fundamental miscarriage of justice exception. *See id*. Midgett has not argued or demonstrated that either exception applies.

Alternatively, notwithstanding the default, Midgett has not shown entitlement to relief. Midgett has not shown prejudice as a result of counsel's failure to ask that the jury be instructed that the counts–different degrees of murder–represented alternative theories and that they were to convict him of only one count. In convicting him of count one, the jury found that the State proved all elements of second degree murder beyond a reasonable doubt. The Court notes that Midgett's jury was instructed, consistent with Florida's standard jury instructions, that, "[i]f you return a verdict of guilty, it should be for the highest offense which has been proven beyond a reasonable doubt." (Doc. 19, Ex. 27, Vol. VIII, p. 891). *See* Fla. Std. Jury Inst. (Crim.) 3.12. Accordingly, Midgett can only speculate that the jury would have convicted him of third degree felony murder had they been instructed that they could only find him guilty of one count. Speculation is not a basis for federal habeas relief. *See Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (a federal court may not grant habeas relief "on the basis of little more than speculation with slight support."); *Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991) (vague, conclusory, or unsupported

allegations cannot support an ineffective assistance of counsel claim).

Nor has Midgett shown that counsel was ineffective in not raising a double jeopardy argument. The Double Jeopardy Clause protects against multiple punishments for the same offense. *Brown v. Ohio*, 432 U.S. 161, 165 (1977). As the state court's order indicates, Midgett did not suffer prejudice as a result of counsel's failure to object because the state court set aside count two and only entered a judgment and sentence on count one. *See, e.g., Claps v. State*, 971 So.2d 131, 133 (Fla. 2d DCA 2007) ("[Double jeopardy's] emphasis is . . . on adjudications of guilt and sentences, not on jury verdicts. While the latter may be a condition precedent to an adjudication of guilt and sentence, by itself a verdict imposes no punishment.").

The state court also found too speculative Midgett's claim that counsel should have moved for a directed verdict or objected when the state court set aside count two, third degree felony murder, instead of count one, second degree murder. Midgett has not cited any authority providing that the trial court would have had the discretion to vacate the conviction for second degree murder. *See State v. Barton*, 523 So.2d 152, 153 (Fla. 1988) (when one of multiple convictions for the same conduct must be vacated, "the conviction of the lesser crime should be set aside."). Midgett has not established what other argument counsel could have made or what other action counsel could have taken. Accordingly, Midgett has not shown that counsel performed deficiently, or that he was prejudiced as a result of counsel's performance.[6] Because Midgett has not demonstrated that the state

---

[6] To the extent Midgett's claim about a directed verdict raises the same issues as his claim concerning counsel's failure to move for a new trial, he is not entitled to relief for the same reasons discussed in Ground Eleven, *infra*.

court's denial of the claims raised in Grounds Two and Three involved an unreasonable application of *Strickland* or was based on an unreasonable determination of the facts, he is not entitled to relief on these grounds.

Grounds Four and Five

Midgett argues that trial counsel was ineffective in failing to challenge the verdict form and move to dismiss the "confusing" jury instructions. (Doc. 10, p. 13).[7] He alleges that the court provided an erroneous instruction on manslaughter as a lesser-included offense of second degree murder, and that counsel should have objected to the jury instructions, including instructions on "actual possession" of a firearm, as "too confusing for a proper verdict to be rendered." (*Id.*, p. 15). Midgett contends that handwritten notations on a copy of the jury instructions, including question marks, checks, and "x" marks, illustrated the jury's confusion. Midgett asserts that the verdict form was confusing because it "co-mingled" primary and lesser-included offenses. (*Id.*). He also contends that counsel was ineffective in failing to move to dismiss the felony information on the basis that the charges violated double jeopardy. The state court denied Midgett's claims:

> In his motion, Defendant raises the following claims for relief:
>
> 3) Trial counsel provided ineffective assistance of counsel for failing to object to defective and/or confusing jury instructions. Alternately, the Defendant's jury instructions and/or verdict forms were fundamentally flawed regarding

---

[7] Midgett states that his claim is brought "under ineffective assistance and/or fundamental error based on the Petitioner's constitutional right to adequate jury instructions." (Doc. 10, p. 13). To the extent he alleges fundamental error in the jury instructions distinct from his ineffective assistance claim, his argument is unexhausted because he did not raise it on direct appeal. (Doc. 19, Ex. 2). *See Rodriguez v. State*, 919 So.2d 1252, 1272 (Fla. 2005) (finding a postconviction challenge to jury instructions to be procedurally barred because "it should have been raised on direct appeal."). State procedural rules do not provide for second appeals. *See* Fla. R. App. P. 9.140(b)(3). Accordingly, the claim is procedurally defaulted. *See Smith*, 256 F.3d at 1138. Midgett has not established that an exception applies to overcome the default. Furthermore, he has not established any fundamental error in the jury instructions.

manslaughter and actual possession of a firearm.

4) Trial counsel provided ineffective assistance of counsel for failing to move to dismiss the information based on double jeopardy and the subsequent jury instructions that were rendered confusing, affecting a just and true verdict. . . .

In claim 3, the Defendant asserts that trial counsel provided ineffective assistance of counsel for failing to object to defective and/or confusing jury instructions. Alternately, the Defendant's jury instructions and/or verdict forms were fundamentally flawed regarding manslaughter and actual possession of a firearm. The Defendant's claim is of no legal merit. The jury was properly instructed on the lesser included offense of manslaughter and the Defendant's assertions on what may have confused the jury is pure conjecture. The Defendant's assertions as to why the jury may have placed certain notations on the instructions provided by the court is again pure conjecture. Accordingly, claim 3 is DENIED.

For the reasons stated as to claim[s] 1, 2, and 3, claim 4 is DENIED.

(Doc. 19, Ex. 7, p. 1140).

Because Midgett did not appeal the denial of these claims, they are unexhausted and, consequently, are procedurally defaulted. *See Smith*, 256 F.3d at 1138. Midgett has not established that an exception applies to overcome the default. Alternatively, notwithstanding the default, he fails to show that he is entitled to relief.

Midgett has not established an error in the jury instructions to which counsel should have objected. To the extent the state court's determination that the manslaughter instruction was proper involves an application of state law, it must be afforded deference. Although Midgett's ineffective assistance of counsel claim is a federal constitutional claim, when "the validity of the claim that [counsel] failed to assert is clearly a question of state law, . . . we must defer to the state's construction of its own law." *Will v. Sec'y, Dep't of Corr.*, 278 Fed. App'x 902, 908 (11th Cir. 2008) (quoting *Alvord v. Wainwright*, 725 F.2d 1282, 1291 (11th Cir. 1984)). *See also Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338,

1354-55 (11th Cir. 2005) ("The Florida Supreme Court already has told us how the issues would have been resolved under Florida state law had [petitioner's counsel] done what [petitioner] argues he should have done . . . It is a 'fundamental principle that state courts are the final arbiters of state law, and federal habeas courts should not second-guess them on such matters.'" (quoting *Agan v. Vaughn*, 119 F.3d 1538, 1549 (11th Cir. 1997))). Further, the manslaughter instruction (*see* Doc. 14, Ex. 27, Vol. II, pp. 302-03) was consistent with the standard instruction in effect at the time of trial. *See In re Amendments to Standard Jury Instructions in Criminal Cases-Instruction 7.7*, 41 So.3d 853 (Fla. 2010).

Nor has Midgett established that the verdict form improperly "comingled" the charged and lesser-included offenses. Under each count, the verdict form set out the options of: finding Midgett guilty of the charged offense; finding Midgett guilty of a lesser-included offense; or finding Midgett not guilty. Under each offense, the verdict form provided options for any additional factual findings to be considered by the jury (such as, for example, whether Midgett did or did not possess a firearm). (Doc. 19, Ex. 27, Vol. II, pp. 321-23). Midgett's argument that the jury was confused by either the instructions or the verdict form, and that handwritten notations on the jury instructions support this conclusion, is too speculative to warrant relief. Midgett has not established that the jurors, who did not ask any questions about the instructions or the verdict form during their deliberations (see Doc. 19, Ex. 27, Vol. VIII, pp. 897-904), were confused, or that an objection by counsel would have clarified any potential confusion such that the outcome of the trial would have been different. *See Bartholomew*, 516 U.S. at 8; *Tejada*, 941 F.2d at 1559. Midgett has not established that counsel was ineffective in failing to object to the instructions or verdict form.

Finally, Midgett has not demonstrated that counsel was ineffective in failing to raise a double jeopardy challenge to the charging document, or that he was prejudiced by counsel's performance. *Cf. Claps*, 971 So.2d at 132-33 ("[A] defendant may be charged and tried for both an offense and a necessarily lesser-included offense even though the defendant cannot ultimately be adjudicated and sentenced for both offenses due to the protections afforded by the prohibition against double jeopardy."). *See also State v. Sholl*, 18 So.3d 1158, 1162 (Fla. 1st DCA 2009) ("[D]ouble jeopardy protections may not be extended to an earlier stage of the proceeding, such as the filing of the information or jury selection."). Midgett has not shown that the state court's denial of his claims involved an unreasonable application of *Strickland* or was based on an unreasonable determination of fact. He is not entitled to relief on Grounds Four or Five.

Ground Six

Florida Department of Law Enforcement crime laboratory analyst Shallyn McFarland, who analyzed the firearm recovered from Midgett's bedroom closet, testified as an expert witness in the field of firearms analysis. (Doc. 19, Ex. 27, Vol. VI, p. 597). The State asked her about the force needed to fire the gun:

Q. When you tested the firearm for operability, did you test the trigger pull weight?

A. Yes, I did.

Q. And what was the trigger pull weight?

A. Let me refer to my report. The trigger pull weight was approximately three and three-quarter to four pounds.

Q. Okay. So they would have - - so whoever fires that firearm would have to put three and three-quarter to four pounds worth of pressure on that trigger in order to engage the firing pin and shoot the bullet?

A.  Yes.

(Doc. 19, Ex. 27, Vol. VII, p. 612).

Midgett asserted that the shooting was accidental.  Midgett contends that the above questions and answers contained inferences that the amount of pressure necessary to discharge the firearm was heavy enough that he could not have discharged it accidentally. He claims that counsel was in effective in "not requiring the State to lay a proper foundation before" presenting this testimony, and in not asking McFarland "how much poundage (trigger pull) the average gun has, as opposed to a 'hair trigger,' etc." (Doc. 10, p. 16).  He claims that counsel's failure to challenge McFarland's testimony allowed the prosecutor in closing arguments to "harp on the fact that the gun could not have accidentally discharged." (*Id*.).  He further claims that counsel failed to object to the prosecutor's remarks.  The state court denied this claim:

> In claim 7, the Defendant asserts that trial counsel provided ineffective assistance of counsel for failing to object to [an] improper inference inferring intent without laying a proper foundation regarding trigger pressure.  In its response, incorporated herein by reference, the State argues that the Defendant's claim should be denied.  The Court agrees.  The State did lay a foundation and had Shallyn McFarland qualified as an expert and that there was no testimony indicating that the firearm could not be accidentally discharged due to the weight of the firearm[']s trigger pull.  The Court agrees. Trial counsel cannot be found ineffective for making meritless claims. Accordingly, claim 7 is DENIED.

(Doc. 19, Ex. 10, p. 1240).

The State's response provides:

> Defendant claims that trial counsel "erred by not requiring the [S]tate to lay a proper foundation before it indicated the trigger pull was heavy enough that it would not be 'accidentally' discharged."  However, there was nothing for trial counsel to object to.  There is no indication that the State failed to lay the proper foundation.

Shallyn McFarland, the witness, cited her qualifications when she first took the witness stand. She was then accepted as an expert in firearms analysis without objection from the defense. Near the end of her testimony, McFarland testified, and was cross-examined, regarding the trigger pull and the pressure needed to discharge the firearm. Even assuming, arguendo, that trial counsel would have objected, it is speculative that the Court would have sustained the objection. The Defendant indicates that the State failed to lay a proper foundation before getting the witness to imply that the firearm would not have accidentally discharged. However, the witness never testified the firearm would not have accidentally discharged due to the weight of the trigger pull, or for any other reason. This claim should be denied.

(Doc. 19, Ex. 8, pp. 1164-65) (State's record citations omitted).

As the state court noted, McFarland did not testify that the firearm could not have been accidentally discharged. (See Doc. 19, Ex. 27, Vol. VI, pp. 596-605; Vol. VII, pp. 606-14). And whether the State laid a proper foundation for McFarland's testimony by qualifying her as an expert witness in firearms analysis involves an application of state evidentiary law to which this Court must defer. *See Will*, 278 Fed. App'x at 908; *Herring*, 397 F.3d at 1354-55.

The other aspects of Midgett's claim–that counsel should have asked McFarland about an average trigger pull, that counsel's deficiency allowed the State to argue the impossibility of an accident in closing argument based on McFarland's testimony, and that counsel failed to object during closing argument–are unexhausted because Midgett did not present them on appeal. (Doc. 19, Ex. 18, pp. 29-31). Midgett has not established that either exception applies to overcome the resulting procedural default. *See Smith*, 256 F.3d at 1138.

Alternatively, he fails to show that his counsel was ineffective. To the extent Midgett argues that counsel should have asked McFarland how much pressure it would take to discharge the average gun, his claim is too speculative to warrant relief because he does

not offer any evidence of what McFarland's answer would have been. *See Bartholomew*, 516 U.S. at 8; *Tejada*, 941 F.2d at 1559. And even if her answer indicated that the discharge could have been accidental, Midgett has not established prejudice as a result of counsel's failure to elicit this information. Midgett did not argue that he accidentally shot and killed Ward; rather, he argued that his shot was not the fatal one, and that John Draper killed Ward from inside the home. Further, the prosecution presented other evidence from which the jury could have concluded that Midgett did not unintentionally discharge his gun. The State's evidence showed that days after either Midgett or D.B. bought ammunition, Midgett went to Ward's house holding a cocked, loaded firearm with the intent to confront Ward over a matter that had made D.B. very upset both in the past and on the night of the shooting, but that Ward immediately rebuffed him.

Nor does Midgett show that counsel was ineffective because his failure to object during McFarland's testimony allowed the prosecutor to argue the impossibility of an accident, or that counsel was ineffective in failing to object to the prosecutor's argument. During closing argument, the prosecutor stated:

> Now, Mr. Midgett said to the police that it was an accident. Well, it was no accident. He went over there and he had that firearm, which you heard analyst [Shallyn McFarland] say yesterday that the weight that you have to exert on that trigger is anywhere from three and a quarter, three and three quarters of a pound to four pounds.
>
> Members of the jury, the person who shot that gun, Joey Midgett, had to mean to shoot it when he pulled that trigger. It wasn't just some, oh, the gun went off. It was that the gun was shot intentionally. It wasn't an accident.

(Doc. 19, Ex. 27, Vol. VII, pp. 815-816). As addressed, the state court determined that McFarland's testimony was properly admitted. Midgett has not shown that the prosecutor acted improperly when he argued about a logical inference he believed the jury should

draw from McFarland's testimony. *See United States v. Johns*, 734 F.2d 657, 663 (11th Cir. 1984) (A prosecutor is permitted to argue inferences he believes the jury can draw from the evidence); *McArthur v. State*, 801 So.2d 1037, 1040 (Fla. 5th DCA 2001) ("The courts generally allow wide latitude in closing arguments by permitting counsel to advance all legitimate arguments and draw logical inferences from the evidence."). And Midgett has not shown that he was prejudiced by the prosecutor's remark when considering it in the context of the entire trial. *See United States v. Hall*, 47 F.3d 1091, 1098 (11th Cir. 1995) (a defendant's substantial rights "are prejudicially affected [by an improper prosecutorial comment] when a reasonable probability arises that, but for the remarks, the outcome [of the trial] would be different." (citing *Kennedy v. Dugger*, 933 F.2d 905, 914 (11th Cir. 1991))).

As Midgett fails to establish that the state court unreasonably applied *Strickland* or unreasonably determined the facts in denying his claim, he is not entitled to relief on Ground Six.

Ground Seven

Midgett claims that trial counsel was ineffective in failing to introduce evidence of injuries to his fingers. He claims that this evidence would have supported a theory that the gun fired accidentally when his hand was caught in the door, thereby bolstering his credibility. The state court denied this claim:

> In claim 8, the Defendant asserts that trial counsel provided ineffective assistance of counsel for failing to produce/enter evidence of Defendant's injured fingers which would have supported the defense theory and bolstered the Defendant's credibility. In its response, incorporated herein by reference, the State argues that the Defendant's claim should be denied. The Court agrees. As the State argues, trial counsel did call Aaron Campbell who testified concerning the Defendant's injured finger. Additionally, the

Defendant testified concerning his injured finger and testified that he **did not** receive medical treatment for his finger. Trial counsel cannot be found ineffective for failing to produce medical records that apparently do not exist.

The State argues that the Defendant's claim that trial counsel was ineffective in not entering into evidence a photograph of the injured fingers is without merit as several witnesses had testified to the fact that his fingers were injured and that a photograph would not have made a difference in the outcome of the trial. The Court agrees. Accordingly, claim 8 is DENIED.

(Doc. 19, Ex. 10, p. 1240) (emphasis in original).

The State's response, which the court incorporated into its order, provided:

Trial counsel questioned witness Aaron Campbell about Defendant's injured fingers. Campbell reported that the Defendant made a statement about his fingers getting caught in the door and that this fingers were hurting. The Defendant also testified to his fingers being hurt by the slamming of the door. The Defendant testified that he did not receive any medical treatment for his fingers. However, the Defendant is now claiming that trial counsel was ineffective for not producing medical records that were supposedly available. The Defendant had already testified under oath that he did not receive medical attention for his fingers. Trial counsel should not be deemed ineffective for failing to produce that which does not exist. The Defendant also alleges that trial counsel was ineffective for failing to enter into evidence a photograph of the alleged injury to the finger. As previously stated, the jury heard from several sources about the defendant's alleged injury. It would be speculative to think that the jury's verdict would have been different if a picture of this injury would have been introduced. The jury had this information in front of them when they reached a verdict. This claim should be denied.

(Doc. 19, Ex. 8, pp. 1165-66) (State's record citations omitted).

The state court did not unreasonably deny this claim. First, Midgett has not established that any medical records existed. As the state court pointed out, Midgett testified that he did not seek medical attention. (Doc. 19, Ex. 27, Vol. VII, p. 743).

Further, even if such records existed,[8] and even if photographs of his fingers existed,[9] Midgett has not shown a reasonable probability that providing them to the jury would have changed the outcome of the trial in light of other evidence of his injury as described in the state court's order. Accordingly, Midgett has not shown that the state court unreasonably applied *Strickland* or unreasonably determined the facts in denying his claim. He is not entitled to relief on Ground Seven.

Ground Eight

Ground Eight concerns counsel's performance in connection with defense witness Samuel Collins. Midgett wanted to call Collins, who lived in the same rooming house as John Draper, to testify about Draper's actions around the time of the murder and threats Draper had allegedly made.

Counsel first proffered Collins's testimony. Collins stated that John Draper was upset when the victim, Jonas Ward, distributed photographs of D.B. because Draper "really liked" D.B., and that Draper had a quick temper, had made some threatening comments to Collins and others in the house, and said he had weapons. (Doc. 19, Ex. 27, Vol. VII, pp. 639-40). According to Collins, Draper said he was at Ward's house at one point but left when pictures were taken because he was so upset about what happened between Ward

---

[8] In his reply, Midgett for the first time alleges that records were created during a medical examination at the jail after his arrest. When a federal habeas petition alleges different supporting facts for a claim of ineffective assistance, the petitioner has not fairly presented his federal claim to the state court. *Weeks v. Jones*, 26 F.3d 1030, 1044-46 (11th Cir. 1994); *Anderson v. Harless*, 459 U.S. 4, 6 (1982); *Footman v. Singletary*, 978 F.2d 1207, 1211 (11th Cir. 1992). Accordingly, this aspect of Midgett's claim is unexhausted and is now procedurally defaulted. *See Smith*, 256 F.3d at 1138. Furthermore, as Midgett presents no evidence of such documentation, his claim is too speculative to establish entitlement to relief. *See Bartholomew*, 516 U.S. at 8; *Tejada*, 941 F.2d at 1559.

[9] Detective Campbell testified that he "believe[d]" Midgett's fingers were photographed. (Doc. 19, Ex. 27, Vol. VI, p. 594).

and D.B.. (*Id.*, pp. 641-42). Collins said that when he returned home from work the night of the murder, Draper's truck was gone. (*Id.*, p. 643). Collins testified that Draper arrived "real dirty" the next morning, gave Collins a strange look, and said that he was upset about what had happened. (*Id.*, p. 642-43).

After the proffer, the court asked counsel what relevant evidence he intended to enter through Collins's testimony. Counsel summarized:

> I plan to bring in the fact that [Collins] saw John Draper that morning - - the morning that Jonas Ward was killed - - I don't think he can [remember] the date - - but the same morning that Jonas Ward was killed, that he was dirty, that John Draper had a bizarre look about him, that John Draper was friends with Jonas Ward and [D.B.] . . . , and that John Draper had made statements of a threatening manner towards Jonas - - or not towards - - he made threatening statements and he was upset about what had happened between [D.B.] and Jonas.

(*Id.*, pp. 651-52).

The court ruled on the parameters of Collins's testimony before the jury:

> THE COURT: All right. We have exhausted this. What we're going to do is go forward. I will not allow any hearsay. I will not allow - - he has already established a record here on the record, and you already indicated you're not going to be getting into the drug issue.
>
> [COUNSEL]: No, sir, I'm not.
>
> THE COURT: I think that his testimony will probably be limited to a few questions.
>
> [COUNSEL]: I agree.

(*Id.*, pp. 656-67).[10]

Midgett now argues that counsel was ineffective in "acquiesc[ing]" that Collins'

---

[10] Collins testified before the jury that he knew D.B. was angry at Ward; that Draper's truck was missing the night of the murder; that Draper was dirty the next morning; and that Draper went by John John. (Doc. 19, Ex. 27, Vol. VII, pp. 724-35).

[proffered] testimony was hearsay, which allowed the State to suppress . . . exculpatory testimony that proved Draper's motive and intent." (Doc. 10, p. 18). He claims that counsel should have argued that Collins had "first party knowledge" of Draper's statements and that Collins's testimony corroborated both the defense's theory and Jonathan Markley's testimony about the man who came to his house party around New Year's. (*Id.*).

The state court denied his claim:

> In claim 9, the Defendant asserts that trial counsel provided ineffective assistance of counsel by acquiescing to the State's argument that Samuel Collins' proffer amounted to hearsay, thus, excluding exculpatory evidence from the jury's consideration. In its response, incorporated herein by reference, the State argues that the Defendant's claim should be denied. The Court agrees. As the State points out, trial counsel did not acquiesce to Samuel Collins' testimony and the trial court did not allow hearsay testimony from Mr. Collins. Accordingly, claim 9 is DENIED.

(Doc. 19, Ex. 10, pp. 1240-41).

The State's response provides:

> The Defendant . . . has not shown any way in which trial counsel acquiesced. The Court allowed trial counsel to proffer Collins' testimony. Afterwards, the parties argued as to what Collins should be allowed to testify to. The State did not argue that Collins' testimony was hearsay. The Court came to the conclusion that Collins would be allowed to testify to relevant evidence and not hearsay. Trial counsel did not acquiesce to any arguments by the State. This claim should be denied.

(Doc. 19, Ex. 8, p. 1166) (State's record citations omitted).

As the state court noted, counsel did not specifically concede that Collins's proffered testimony contained impermissible hearsay. Further, to the extent that the court's ruling prohibited Collins from testifying about comments that he heard Draper make, Midgett does not explain how such testimony did not contain impermissible hearsay, or which hearsay exceptions would apply to allow such testimony. *See* § 90.801(1)(c), Fla. Stat. ("'Hearsay'

is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."). And this Court must defer to the state court's application of Florida's evidentiary law. *See Will*, 278 Fed. App'x at 908; *Herring*, 397 F.3d at 1354-55.

At the end of his claim, Midgett asserts that "Collins' testimony was reduced to little or no value, albeit, counsel's inadequate examination once Samuel Collins went before the jury." (Doc. 10, p. 19). To the extent Midgett intends to raise a distinct claim that counsel was ineffective in questioning Collins before the jury, his claim is unexhausted because he did not raise it on collateral appeal. (Doc. 19, Ex. 18, pp. 34-35). Notwithstanding the lack of exhaustion and resulting procedural default, *see Smith*, 256 F.3d at 1138, Midgett cannot show entitlement to relief. His claim is vague and conclusory, and Midgett does not identify how counsel's examination of Collins before the jury constituted deficient performance. *See Bartholomew*, 516 U.S. at 8; *Tejada*, 941 F.2d at 1559.

Midgett has not shown that the state court's denial of his claim involved an unreasonable application of *Strickland* or was based on an unreasonable determination of the facts. He is not entitled to relief on Ground Eight.

Ground Twelve

Ground Twelve concerns counsel's performance in connection with witness John Draper. After counsel proffered Collins's testimony, Collins, without provocation, stated that "this man is a threat and is saying nasty remarks to me" and requested to "have someone for [his] safety." (*Id.*, pp. 653, 654). He was removed from the courtroom. (*Id.*, p. 654). The State then acknowledged that Draper had made allegedly threatening comments to Collins, and Collins later told the court that, at the courthouse that day, Draper gave Collins

and others "dirty looks" and said, "look at that bunch of faggots." (Doc. 19, Ex. 27, Vol. VII, pp. 668-69). Counsel moved for a mistrial due to Draper's threats to Collins. The court denied the motion after finding that, as Draper had not threatened Collins's life or safety, the threats would not affect Collins's testimony. (Doc. 19, Ex. 27, Vol. VII, pp. 660, 670-71).

Defense counsel called Draper. Draper testified before the jury that when he was at Ward's house on Thanksgiving, he left because "things" happened between Ward and D.B. that upset him. (Doc. 19, Ex. 27, Vol. VII, pp. 693-95). But he denied shooting Ward, being present when Ward was shot, or expressing that he was upset about "what happened." (*Id.*, pp. 695-96). The State then called Draper as a rebuttal witness to contradict Jonathan Markley, who had testified that John John came to a party at his house around New Year's and said that he had killed "the pervert." Draper testified that he did not know Jonathan Markley, had never been to the street where Markley lived, did not go to a house party on December 29, 2009, and had never gone by the nickname John John. (Doc. 19, Ex. 27, Vol. VIII, pp. 796-97).

Midgett first contends that counsel was ineffective in failing to "properly argue, object, and preserve the motion for mistrial." (Doc. 10, p. 23). He also contends that counsel should have argued that the State's calling Draper after he failed to appear for a pre-trial deposition "amounted to ambushing of the defense's case" and asserts that counsel was not prepared to question Draper. (*Id.*, p. 24). Finally, Midgett claims that counsel should not have called Draper without having deposed him, and that counsel failed to properly question Draper about 1) his relationship with the victim, Jonas Ward; 2) Ward's bragging about sexual encounters with D.B.; 3) whether Draper was present when the

photographs were taken; and 4) whether Draper ever lived with Ward.  (*Id.*).

The state court denied Midgett's claim after an evidentiary hearing:

> In claim 12, the Defendant asserts that trial counsel provided ineffective assistance of counsel for failing to object to the testimony of John Draper (being allowed to take the stand) and for failing to properly argue, object, and preserve the motion for mistrial.
>
> As the State points out in its *State's Memorandum for Evidentiary Hearing of August 20, 2015; Directing Attention, Portions of the Record Which Refute Defendant's Claims*, which the Court has previously incorporated herein by reference, the Defendant called John Draper as a witness.  Trial counsel's strategy was to attempt to show that John Draper had a motive to shoot the victim.  Trial counsel's testimony at the evidentiary hearing was that, while he had not been able to depose Mr. Draper, he was prepared for his testimony.
>
> The Court finds, as argued in its *State's Memorandum for Evidentiary Hearing of August 20, 2015; Directing Attention, Portions of the Record Which Refute Defendant's Claims*, trial counsel moved for a mistrial based on the alleged threats by Mr. Collins to Mr. Draper [sic].  The trial court denied the motion.  The Defendant's claim is refuted by the record.  Trial counsel was not ineffective as argued by the Defendant.  Accordingly, claim 12 is DENIED.

(Doc. 19, Ex. 16, pp. 1693-94).  The State's memorandum provides:

> [I]t was the Defendant who called John Draper to the witness stand. Furthermore, it was a calculated tactical decision to do so.  Finally, trial counsel did in fact move and properly argue for a mistrial based on alleged threats to Mr. Collins by Mr. Draper.  However, after carefully considering all respective arguments the court made findings of fact and denied Defendant's motion stating "I find absolutely no basis for it."

(Doc. 19, Ex. 12, p. 1481) (State's record citations omitted).

Midgett fails to show ineffective assistance regarding his counsel's motion for mistrial.  He claims that counsel "should have argued and renewed his motion for mistrial that Collins was to[o] traumatized and afraid to testify." (Doc. 10, p. 26).  But in moving for a mistrial, counsel argued that, due to Draper's threats, Collins was "very upset, he's very emotional, he's been crying out there that he's scared. . . . He is shaking, and he does not

want to testify unless he has to." (Doc. 19, Ex. 27, Vol. VII, pp. 659-60). Midgett does not establish any reasonable probability that repeating the argument or rephrasing it as he suggests would have resulted in the court's granting his motion for mistrial.

Nor does Midgett show that counsel was ineffective with respect to Draper's testimony. At the postconviction evidentiary hearing, counsel testified that he was surprised Draper was present for trial, but that he was prepared for Draper's testimony. (Doc. 19, Ex. 11, pp. 1383-84). Therefore, Midgett has not shown that counsel had any reason to object to the State's calling Draper due to his failure to appear for a deposition. And he has not established how counsel could have argued that the State's calling Draper amounted to an "ambush" after the defense called Draper.

Finally, Midgett's claim that counsel was ineffective in failing to ask Draper specific questions is unexhausted due to his failure to raise it on collateral appeal. (Doc. 19, Ex. 18, pp. 27-29). Notwithstanding the lack of exhaustion and resulting procedural default, Midgett does not demonstrate that his counsel was ineffective in failing to ask Draper about his relationship with Ward. Counsel did question Draper about his presence at Ward's house the night the alleged assault occurred. (Doc. 19, Ex. 27, Vol. VII, pp. 693-94). But Midgett does not explain the significance of the other questions he believes counsel should have asked, or what answers Draper would have provided. Accordingly, his claim is too speculative to show that counsel was ineffective in failing to ask Draper any other particular questions, or a reasonable probability that the outcome of trial would have been different had counsel done so. *See Bartholomew*, 516 U.S. at 8; *Tejada*, 941 F.2d at 1559.

Midgett has not shown that the state court's denial of his claim involved an unreasonable application of *Strickland* or was based on an unreasonable determination of

the facts.  He is not entitled to relief on Ground Twelve.

Ground Nine

Midgett argues that trial counsel was ineffective in failing to object to improper prosecutorial comments during closing argument and in failing to preserve the issue for appellate review.  Midgett asserts that these statements were based upon facts not in evidence and contained improper speculation and inferences.  In his postconviction motion, he identified four prosecutorial statements:

> [Midgett] left his house at 1706 Holly Drive with two people in his truck, Holly Evans and [D.B.].  He left his house and drove over to Jonas Ward's house at 2943 Lunar Circle with evil in his heart and hatred, anger and spite running through his veins.
> . . .
>
> Jonas shut the door.  As he started to shut the door, as you heard in his statement, Joey Midgett reached up to stop him and Jonas kept pushing, slammed his finger in the door, and when Joey Midgett realized that this wasn't to go down as easily as he thought, he shot Jonas Ward through the door.
> . . .
>
> [T]he same door that Joey Midgett tried to force his way into, and the same door that Joey Midgett shot through when he realized he couldn't get into the house and get those photographs.
> . . .
>
> [Midgett] went over there and he had a firearm, which you heard analyst [Shallyn McFarland] say yesterday that the weight that you have to exert on that trigger is anywhere from three and a quarter, three and three quarters of a pound to four pounds.  Members of the jury, the person who shot that gun, Joey Midgett, had to mean to shoot it when he pulled the trigger.

(Doc. 19, Ex. 27, Vol. VIII, pp. 807-08, 811, 816).

The state court denied Midgett's ineffective assistance claim:

> In claim 11, the Defendant asserts that trial counsel provided ineffective assistance of counsel for failing to object and/or preserve for appellate review the improper comments of the prosecutor in closing arguments.  In its

response, incorporated herein by reference, the State argues that the Defendant's claim should be denied. The Court agrees. The Court finds that the State was simply arguing inferences based on the evidence presented at trial and that any objection by trial counsel would have been meritless. Accordingly, claim 11 is DENIED.

(Doc. 19, Ex. 10, p. 1241).

The State's response provides:

Defendant claims that trial counsel should have objected to, among other things, the comment that the prosecutor made that the Defendant acted with "evil in his heart and hatred, anger and spite running through his veins." In order to secure a conviction for a second-degree murder charge, the State must prove that the Defendant acted with a depraved mind. In order to show that he possessed a depraved mind, the State must prove that he acted with ill will, hatred, spite or with an evil intent. Rayl v. State, 765 So.2d 917 (Fla. 2d DCA 2000). That is the reason that the State used these words to describe the Defendant during closing arguments. The State was arguing inferences from the record. The Defendant cites a few other examples of other statements during closing that he claims his trial counsel should have objected to. However, these statements reflect the prosecutor making inferences on the evidence which is the purpose of closing arguments. Watson v. State, 50 So.3d 685 (Fla. 3d DCA 2010). This claim should be denied.

(Doc. 19, Ex. 8, pp. 1167-68) (State's record citations omitted).

As the state court noted, and as addressed, attorneys may argue inferences they believe the jury should draw from the evidence. *See Johns*, 734 F.2d at 663; *McArthur*, 801 So.2d at 1040. In contending that Midgett shot Ward when Midgett could not get inside, the prosecutor was simply arguing his theory of the case–that Midgett shot Ward when Ward would not give him the images that had caused Midgett's girlfriend, D.B., to become distraught. Similarly, because the evidence showed that Ward's actions had upset D.B., the prosecutor was arguing the inference that Midgett acted out of ill will, hatred, spite, or with an evil intent, as necessary to prove second degree murder. Finally, as addressed in Ground Six, the state court determined that McFarland's testimony was

properly admitted, and Midgett does not establish that the prosecutor's argument about her testimony was anything other than a logical inference he believed the jury could infer from her testimony. Accordingly, Midgett has not demonstrated that counsel was ineffective in failing to object to the identified comments. Nor does he establish that counsel was ineffective in failing to preserve issues for appeal. *See United States v. Winfield*, 960 F.2d 970, 974 (11th Cir. 1992) ("[A] lawyer's failure to preserve a meritless issue plainly cannot prejudice a client."). Because he does not show that the state court unreasonably applied *Strickland* or unreasonably determined the facts in denying his claim, he is not entitled to relief on Ground Nine.

Ground Eleven

Midgett argues that trial counsel was ineffective in failing to file a motion for new trial "to preserve the weight and sufficiency of the evidence." (Doc. 10, p. 21). He contends that, in support of a motion for new trial, counsel could have argued that: the State's case did not overcome his reasonable hypothesis of innocence; no physical evidence or eyewitness testimony contradicted his theory; Markley's and Collins's testimony implicated Draper; Draper threatened Collins and influenced his testimony; Midgett testified that it was Draper who opened the door; Midgett had no motive to harm Ward, but Draper, D.B., and Ward's girlfriend did; the prosecutor made improper remarks during closing argument; and the jury's verdict was contrary to the law. The state court denied Midgett's claim after an evidentiary hearing:

> In claim 10, the Defendant asserts that trial counsel provided ineffective assistance of counsel for failing to file a motion for new trial to preserve the weight and sufficiency of the evidence. In his Motion, the Defendant lists nine grounds upon which trial counsel might have argued that the weight of the evidence supported the trial court's granting a new trial. All of the nine

grounds cited by the Defendant concern arguments related to the Defendant's theory that there was another shooter. However, the evidence presented at trial was overwhelming as to the Defendant's guilt and clearly point to his being the individual that fired the fatal shot. (See claim 5, above) The evidence and testimony presented at trial simply does not support the Defendant's arguments as listed in his Motion. Trial counsel testified at the evidentiary hearing that the believed a motion for new trial would have [been] meritless. The Court agrees.

The Defendant argued at the hearing that the Defendant's discharge of his gun may have been accidental. As argued by the State, the Defendant does not argue a theory of accidental discharge in his Motion, and therefore, should not be considered by the Court. The Court agrees. Even if the Court were to consider the theory of accidental discharge, the Court finds this argument to be without merit.

[Defense expert] Mr. Knox testified at the evidentiary hearing that the firearm found to be involved in this shooting was a model 1911 handgun. He testified that a model 1911 handgun normally has about a four pound trigger that is among the lighter triggers found on handguns. However, he also testified that the handgun had a hammer that had to be cocked by pulling back the hammer for the gun to fire. It was a single action handgun. The fact that the operator of the handgun must cock the weapon first is the reason it has a lighter trigger. The Defendant was at the front door of the victim's residence with a cocked firearm in his hand. He was there uninvited apparently confronting the resident who was struggling to close the door. A jury could certainly conclude that he then intended to fire the gun. Mr. Knox also testified that the Defendant had an injury to his hand consistent with a struggle at the front door, possibly occurring when the door was closed on his hand. He theorized that the gun could possibly discharge when the Defendant was involved in a struggle at the front door. However, he also testified that the evidence established that the gun was fired when the muzzle was one to two feet from the door. Such a scenario would be inconsistent with a struggle that was occurring at the front door wherein the Defendant caught his hand in the door jamb. The Court finds that, the Defendant's theory of an accidental discharge would not have supported the granting of a new trial.

Based on the above, claim 10 is DENIED.

(Doc. 19, Ex. 16, pp. 1692-93).

A motion for new trial is governed by Florida law, and, specifically, the grounds for

a new trial are set out in Florida Rule of Criminal Procedure 3.600. As the state court noted,

counsel testified that he would have moved for a new trial if he thought any meritorious grounds existed. (Doc. 19, Ex. 11, p. 1408). The court's determination that counsel correctly concluded no basis existed, and that Midgett's proposed arguments were insufficient to grant a new trial, involves an application of Florida law. This Court must defer to the state court's determination that the issues raised by Midgett would have failed to meet the standard for a new trial. *See Will*, 278 Fed. App'x at 908; *Herring*, 397 F.3d at 1354-55. Accordingly, Midgett does not show that the state court unreasonably applied *Strickland* or unreasonably determined the facts in denying his claim. He is not entitled to relief on Ground Eleven.

Ground Ten

Midgett contends that trial counsel was ineffective in failing to hire an expert witness in the areas of ballistics, blood spatter, and crime scene reconstruction to testify at trial that Midgett could not have fired the fatal shot. While conceding that counsel made this argument based on the position of the victim's body, the blood spatter, and the path of the bullet (*see* Doc. 19, Ex. 27, Vol. VIII, pp. 826-30, 835), Midgett claims that counsel needed an expert to support and provide a proper basis for this argument.

At the postconviction evidentiary hearing, counsel testified that he did not consult an expert witness to see if the forensic evidence could have corroborated the "second shooter" theory. (Doc. 19, Ex. 11, p. 1379). He explained that he did not want to pursue the second shooter theory, but that Midgett "wanted to go with" it and they made a "tactical move . . . to put the blame on someone else." (*Id.*, p. 1391, 1401). Counsel stated that the FDLE test results "matched everything up. There was not any other physical evidence that was good to argue from a forensic standpoint." (*Id.*, p. 1379). In other words, he testified,

he knew that if he hired an expert, he or she would have actually contradicted his theory. (*Id.*, p. 1380). Counsel further testified that he did not believe that any expert would have supported the second shooter theory. (*Id.*, p. 1404). Midgett called Michael Knox. Knox, a forensic consultant, testified as an expert in crime scene reconstruction including ballistics and blood spatter evidence. (*Id.*, p. 1420).

The state court denied Midgett's claim:

In claim 5, the Defendant asserts that trial counsel provided ineffective assistance of counsel for failing to investigate, consult, and obtain an expert in ballistics that would have established the bullet found inside the victim's residence was not the same bullet that passed through the door and killed the victim, thereby supporting the defense's theory that another shooter fired the fatal shot.

The Court has examined the transcript of the trial in this case. The Court finds that the *State's Memorandum for Evidentiary Hearing of August 20, 2015; Directing Attention, Portions of the Record Which Refute Defendant's Claims,* filed on August 20, 2015 and incorporated herein by reference, contains an accurate synopsis of the facts adduced at the trial of this case. The Defendant's claim is that the bullet found inside the victim's residence was not the same bullet that passed through the door and killed the victim. The testimony at trial established that only one bullet casing was found on the front porch of the residence and only one projectile was found inside the residence. The bullet was matched to a .45 caliber pistol and ammunition found inside a wall at the Defendant's residence.

Michael Knox's testimony at the evidentiary hearing provided no expert opinion or evidence to support the defense's theory that another shooter fired the fatal shot. Mr. Knox['s] testimony established that one bullet fired by one shooter through the front door of the victim's residence was responsible for the victim's death. Accordingly, the Court finds that trial counsel was not ineffective in failing to investigate, consult, and obtain an expert in ballistics that would have established the bullet found inside the victim's residence was not the same bullet that passed through the door and killed the victim.

Even if the Court were to find, *arguendo*, that trial counsel was ineffective as stated by the Defendant, the Court finds that the employment or testimony of an expert as suggested by the Defendant is not of such nature that it would probably produce an acquittal on retrial. The evidence presented at trial was overwhelming as to the Defendant's guilt. It is clear that a bullet

was fired through the front door of the victim's residence. It was clear that the Defendant fired the bullet from a firearm found in the wall of his house. The Defendant admitted to discharging a firearm at the front door of the victim's residence. Although the Defendant attempted through the testimony of the defense witnesses to argue another had filed the bullet that resulted in the victim's death, there was no evidence to support the Defendant's theory and there is no evidence before the Court, to include the testimony of Mr. Knox, to support the Defendant's theory. Accordingly, claim 5 is DENIED.

In claim 6, the Defendant asserts that trial counsel provided ineffective assistance of counsel for failing to hire an expert witness on reconstruction and blood spatter. The Defendant argues that the expert would have supported the theory that another shooter fired the fatal shot. As with claim 5, Mr. Knox's testimony at the evidentiary hearing does not support the theory that another shooter fired the fatal shot. As with claim 5, the Court finds that the Defendant has failed to establish either prong of Strickland v. Washington, [466 U.S. 668] (1984). Accordingly, claim 6 is DENIED.

(Doc. 19, Ex. 16, pp. 1691-92).

The state court did not unreasonably deny this claim. The record supports the state court's conclusions regarding Michael Knox's testimony. Knox testified about the trajectory of the bullet that went through the door and the blood spatter evidence inside the home. (Doc. 19, Ex. pp. 1423-28, 1439-43). But Knox acknowledged that he could not say another shooter fired the fatal shot from another gun, and that he could not offer support for the theory that someone else killed the victim or used another gun. (*Id.*, pp. 1454-55). He testified that forensic evidence does not reveal whether a gunshot was intentional or unintentional. (*Id.*, p. 1453).

Accordingly, Midgett has not established a reasonable probability that Knox's testimony about the crime scene would have resulted in a different outcome at trial. And he has not identified any other expert witness, or provided evidence of what such a witness would say about the crime scene that would have resulted in a different outcome at trial.

As Midgett has not established that the state court unreasonably applied *Strickland* or unreasonably determined the facts in denying his claim, he is not entitled to relief on Ground Ten.

Ground Thirteen

Midgett argues that newly discovered evidence reveals "a defense theory unknown to [him]" until the postconviction evidentiary hearing. (Doc. 10, p. 26). He claims that Michael Knox's testimony would have supported the theory that he unintentionally discharged the firearm. Midgett further appears to claim that counsel was ineffective in not calling such an expert at trial to present the theory that he unintentionally shot and killed Ward, instead of the "second shooter" theory.

The state court denied these claims when Midgett raised them in a successive motion for postconviction relief:

> Defendant raises a claim of newly discovered evidence based on the testimony of a crime scene expert who testified at an evidentiary hearing related to a previous motion filed by the Defendant pursuant to Rule 3.850, Fla.R.Crim.P. The Defendant contends that the expert's testimony at the evidentiary hearing established that the Defendant could have employed a defense at his trial involving the unintentional discharge of a firearm.
>
> However, the Court finds that the expert's testimony does not constitute newly discovered evidence. Newly discovered evidence must be evidence that was not discoverable at the time of trial. As is evident from the Defendant's instant Motion, the evidence the Defendant claims as newly discovered was clearly discoverable prior to the Defendant's trial. The essence of the Defendant's instant claim as well as claims previously filed by the Defendant is that his trial counsel was ineffective in not employing a crime scene expert.
>
> Based on the above, it is ORDERED AND ADJUDGED that Defendant's *Newly Discovered Evidence Motion for Post-Conviction Relief 3.850(b)* is DENIED.

(Doc. 24-2, p. 3).

To the extent Midgett alleges that Knox's testimony is newly discovered evidence showing that he did not commit second degree murder, his claim is not cognizable on federal habeas review.  *See Herrera v. Collins*, 506 U.S. 390, 400 (1993) ("'[T]he existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus' . . . [because] federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution–not to correct errors of fact." (quoting *Townsend v. Sain*, 372 U.S. 293, 317 (1963))).

Midgett also claims that counsel was ineffective in failing to "hir[e] a crime scene reconstructionist and determine whether the evidence supported Midgett's account that he fired a gun unintentionally that night."  (Doc. 10, pp. 28-29).[11]  To the extent Midgett alleges that Knox's testimony is newly discovered evidence showing that counsel was ineffective, the court rejected his claim on the basis that he failed to establish that the evidence was new.  Whether Midgett met Florida's standard for establishing newly discovered evidence is a question of state law that is not cognizable in this federal habeas petition. *See Wainwright v. Goode*, 464 U.S. 78, 83 (1983) ("[F]ederal courts may intervene in the state judicial process only to correct wrongs of a constitutional dimension.").

Further, Midgett fails to show that his counsel was ineffective.  Midgett claims that counsel should have known an expert was necessary to establish this theory because the evidence showed that a struggle occurred at the door and that he only fired once.  He claims that "[t]he chances of the victim being intentionally killed by one shot through a door

_____

[11] This claim is distinct from the claim raised in Ground Ten that counsel should have hired a crime scene reconstruction expert to testify that the bullet Midgett fired was not the bullet that actually killed Jonas Ward.

without windows is implausible.  The single shot is much more consistent with unintentional discharge."  (Doc. 10, p. 29).

The record shows that counsel knew of this alternative theory and considered presenting it.  But counsel testified that, after consulting with Midgett, he decided not to pursue this course for several reasons.  Counsel thought that an unintentional discharge theory was "problematic" and would not "make sense" to the jury in light of the evidence that Midgett approached the door pointing the gun towards the victim, with his finger on the trigger.  (Doc. 19, Ex. 11, pp. 1415-16).  Further, he testified that Midgett wanted to pursue the second shooter theory.  (Doc. 19, Ex. 11, p. 1391). Midgett also absolutely prohibited counsel from pursuing an alternate theory–that D.B. was the shooter–which counsel believed to be true and to be supported by evidence that a neighbor saw two figures get out of the truck and approach Ward's house.  (Doc. 19, Ex. 11, pp. 1410, 1414). Therefore, counsel was left with either the accidental shooting theory or the second shooter theory, neither of which, he testified, "was good."  (Doc. 19, Ex. 11, p. 1415).  Accordingly, the record establishes that counsel considered presenting the unintentional discharge theory. Midgett does not show that counsel's decision not to do so fell below an objective standard of reasonableness.  *See Strickland*, 466 U.S. at 690-91 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.").

In support of his ineffective assistance claim, Midgett also points to certain portions of Knox's evidentiary hearing testimony that Midgett believes are consistent with

unintentional discharge.  First, Knox testified that Midgett suffered injuries to his left finger and foot consistent with being caught in a door.  Second, Knox testified that the trigger pull weight of the gun recovered from Midgett's home was "on the really light end of a trigger pull." (Doc. 19, Ex. 11, p. 1434).  Midgett asserts that this testimony could have countered the State's argument that an unintentional discharge was unlikely. Third, Knox testified that the crime scene photographs showed that the bullet went through the door while moving slightly upward and slightly from right to left.  (Doc. 19, Ex. 11, p. 1428).  He also stated that the apparent presence of gunshot residue on the door indicated that the muzzle of the gun was about one to two feet from the door.  (*Id.*, p. 1424-25).  Midgett claims that this testimony goes to establishing a scenario in which his left side was caught in the door, and he unintentionally discharged the firearm he held in his right hand "back away from the door a couple of feet."  (Doc. 10, p. 30).  Fourth, Knox testified that people often have a slightly inaccurate perception of fast-paced events. (Doc. 19, Ex. 11, pp. 1444-45).  Midgett claims that this testimony may explain why he erroneously told police that the gun was against the door when it discharged.

Midgett has not demonstrated that the identified testimony establishes ineffective assistance for not calling an expert to support an unintentional discharge theory.  Knox testified at the evidentiary hearing that an unintentional discharge was "plausible" and was consistent with the physical evidence in this case.  (Doc. 19, Ex. 11, pp. 1445, 1451).  But no part of Knox's testimony about the gun's trigger pull reflects that Midgett unintentionally fired the gun.  (*Id.*, pp. 1434-35, 1463-66).  And Knox's testimony indicates that forensic evidence cannot establish whether a gun is discharged unintentionally:

Forensically there is no difference . . . if you can pull [a trigger] intentionally

you can pull it unintentionally. It's the same thing. . . . The shot is the same. The action of the hand is the same. It's all the same. What's different is what's going on in terms of the person's intent–what did they intend to do.

(Doc. 19, Ex. 11, pp. 1452-53).

Finally, Midgett appears to refer to Knox's evidentiary hearing testimony concerning "contra-lateral reflex." Knox testified:

A. [With respect to unintended discharge of a firearm] . . . you can get into contra-lateral reflex where somebody is doing something with one hand while they're holding a gun, have their finger on the trigger and grab something or throw something and then they'll end up squeezing with their gun hand, as well, and discharging.
. . .

A. [ ] The action is that when you have something going on where a person has a gun in their hand and then they're doing things like in this case if you're fighting holding a door and the door gets slammed on your hand. I've seen a case where a woman was pushing – had a gun in her hand pushing a door open with her hand while she was throwing a phone and she pulled the trigger, discharged the gun from over here and it shot the person in the neck. Those types of discharge are what's commonly referred to as a contra-lateral reflex. I'm doing something here with this hand, my weak hand or my non-gun hand, and as a result I respond in kind –

Q. So the brain is telling the fingers to clench?

A. It is. It's just not necessarily that the person in their mid says, "I'm going to pull the trigger" and doing it intentionally. It's basically both sides of the body are clenching in response to something that's happening over here. And because both sides of the body clench, if your finger is on the trigger you're going to pull the trigger. I mean, it's just going to happen.

(Doc. 19, Ex. 11, pp. 1435, 1452).

Midgett appears to argue that, because of contra-lateral reflex, he subconsciously pulled the trigger with his right hand when his left hand was caught in the door. However, no part of Knox's testimony indicates that Midgett discharged his weapon as a result of experiencing contra-lateral reflex. He stated that while he could offer testimony about the

contra-lateral reflex "phenomenon," he could not testify that Midgett did or did not unintentionally discharge the firearm. (Doc. 19, Ex. 11, pp. 1461-62). Midgett fails to demonstrate a reasonable probability that the outcome of the trial would have been different due to the speculative nature of such testimony. Accordingly, Midgett's claim of ineffective assistance of counsel does not relief. *See Bartholomew*, 516 U.S. at 8; *Tejada*, 941 F.2d at 1559. *See also Duran v. Walker*, 223 Fed. App'x 865, 875 (11th Cir. 2007) ("Duran's claim that an expert witness would have prompted the jury to believe his testimony . . . is conclusory and speculative, and does not amount to a showing of prejudice.").

Midgett does not show that the state court's denial of his ineffective assistance claim involved an unreasonable application of *Strickland*, or was based on an unreasonable determination of fact. He is not entitled to relief on Ground Thirteen.

Accordingly, it is **ORDERED** that Midgett's second amended petition (Doc. 10) is **DENIED**. The Clerk is directed to enter judgment against Midgett and to close this case.

## CERTIFICATE OF APPEALABILITY AND
## LEAVE TO APPEAL *IN FORMA PAUPERIS* DENIED

It is **ORDERED** that Midgett is not entitled to a certificate of appealability (COA). A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Rather, a COA must first issue. *Id.* "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." *Id.* at § 2253(c)(2). To make such a showing, Midgett "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004)

(quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)). Midgett has not made the requisite showing in these circumstances. Finally, because Midgett is not entitled to a COA, he is not entitled to appeal *in forma pauperis*.

ORDERED at Tampa, Florida, on August 9, 2018.

Virginia M. Hernandez Covington
VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Joey Midgett
Counsel Of Record